Good morning. I'd like to reserve two minutes for a rebuttal. May it please the court. My name is Mike Farnon and I represent Matthew P. Amos and 24 other individuals who were victims of a stock dilution scheme orchestrated by the defendants in this case. In 2004, Franklin FSC began to administer the... We know the facts of the case. Will that help me with the... It seems the big hurdle here is standing. Is RICO standing. Maybe you can help me with why the district court got that wrong. The big hurdle here is... I'm sorry. Whether or not there's an injury which is... Oh, a direct... Okay. Well, we believe obviously that this... there is direct injury here and the reason for that, Your Honor, is because there is direct injury to the plaintiffs. In this... under the circumstances of this case, you have a situation where the individual defendants lost a substantial portion of their interest in stock. You have... We know you lost. I'm sorry. Yeah. Let me walk you through some steps as I understand them from your complaint and you help me understand it, all right? Okay. The reasoning as I understand it is that there were mail and wire fraud offenses committed against third parties. Is that right? Yes. That's step one. Step two is that those parties discover the fraud, right? Yes. Okay. Then those parties decide to litigate. Okay. Well, let me take it a step back. There is... Yeah. Those parties didn't... did eventually file lawsuits and other... This is all getting to your injury. Correct. First, there's the fraud against the third parties. Then those third parties discover it. Then those third parties decide to litigate, right? Correct. Then there's a choice by some or all of the individual defendants. You treat them as all of the piece. So, for just sake of discussion, we'll say the individual defendants. They decide that they're going to litigate or settle, but eventually settle up in a way that in 2005, they entered into a loan agreement with the corporation. They were themselves the board of directors, okay? The individual defendants in this case were all the board of directors. What are you referring to? The board of directors who are the individual defendants in this case. Right. Okay. They created a loan arrangement whereby they would loan the company $200,000 in exchange. They could get that money back or they would receive... would be able to convert that into stock on the last day of the change of control. I understand about the capital notes. I'm trying to get... You say you've got a direct injury. I'm trying to get to that direct injury. And to get to that direct injury, there had to be a judgment at some point by one or more of the individual defendants. I take it you treat them as acting in concert to settle the disputes that the alleged fraud discovered by third parties committed by the individual defendants, right? Right. Those are the losses. The losses, you allege, are losses associated with settling up these disputes. Is that not true? Well, it is true. But over the course of time, it wasn't just those lawsuits that were causing losses to the company. There were numerous decisions that were being made over the course of time. And this is what we flipped. Let's take the losses to the company, the decisions that you're talking about now. What was the impact on the plaintiffs of all those decisions that you're alleging went into this pattern of racketeering? Franklin Financial agreed to merge with Community Financial Incorporated. In doing so, what they did was agreed to pay $1.13 million. So the value of the company... What was that impact on your plaintiffs? What happened as a result of that? As a result of the stock dilution scheme, my clients who own just under 50% of the interest in Community Financial on the last day of the change of control, they wound up owning less than 7% of the company. As a practical matter, what that meant was that a $1.13 million payout by Franklin Financial to Community Financial, instead of them being able to divide up approximately a half a million dollars, $550,000, what happened was they had to divide up approximately $70,000. So there's a difference between $400,000 and $70,000 that my clients had direct injury as a result of. Doesn't that theory require you to demonstrate? In fact, you have alleged that there was, in effect, a waste of corporate assets separate and apart from the capital notes piece of this, right? Yes. They drove down the price. So going back to my somewhat long series of questions to you, isn't there a whole series of steps that have to have been met in order for your... I love that song. You like that? I'll get it for you. I'm getting that one. It's called the Wristling Ricoh Plainter. I'm going to get that myself. It turns the same thing off and it still does that. So don't any of you guys try that. Isn't it the case that in order for you to have any injury, indeed the injury you allege, there had to have been, you've got to prove, there was fraud on third parties, the third parties discovered it, the third parties decided to sue, the board of directors decided to settle, the settlement ended up costing the company money that it didn't make up in other ways. So there's one, two, three, and ultimately leading to, then the capital notes get brought in, then FSS, Lincoln, excuse me, Franklin Financial decides to buy, and then there's a conversion. I don't think it necessarily has to be in that order. I think that what happened... Well, take it in any order you want. There's like 10 steps there, aren't there? Yes. No matter what order you want to take it in, what is the end result? Now you're arguing a loss of the proportion of the ownership to try to get into Lockheed, but in the complaint it looked to me that you were just focusing on dilution of your shares, the plaintiff's shares. The two things are completely intertwined. You have, in order for this to be, to work... Well, dilution of everyone's shares wouldn't necessarily result in a change in proportion to the ownership. If everybody gets reduced by X percent, the proportion of the ownership remains the same. It's just worth less. But what happened in this case is that the individual defendants in this case wound up walking away with over a million dollars when two days before the change of control, they only owned 50% of the company. So the company was sold for $1.13 million. They were going to get $500,000, but they had created this elaborate scheme in order to drive down the value of the stock on the last... The scheme goes back to 2000, 2001? Well, I'm not sure when it did. I mean, here we are, we're arguing facts now, and that's been a problem in this case from the beginning. Well, actually, I think we're not arguing facts. We're trying to understand how your theory of the facts, your theory of the facts, not somebody else's, fits in with the concept of proximate cause under RICO, which binds this court, right? It's not enough for you to say, we were hurt. We accept for purposes of our discussion that you were injured and that there was some unfairness to it and that your clients have every right to be distressed in the extreme for how things turned out. But that isn't the question. You've pled a RICO claim, and the RICO claim requires you to show proximate cause, a direct injury. That's why we're asking you not about factual disputes, but your facts. How do your facts lead to the legal conclusion that what happened with the ultimate merger and the harm you allege associated with the conversion of the capital notes was proximately caused by mail and wire fraud predicate acts that preceded those things by years and years and occurred to third parties? That's what you need to explain. Okay, and as I mentioned in the brief, we have the Helm litigation. The Helm litigation took place in 2008. It occurred three years after the loan arrangement occurred. So it's in that proximate causation time period that you're talking about. In the Helm litigation, the individual defendants refused to provide information. They used the mails during that. We've alleged that in the complaint. They refused to provide... The district court was concerned about the nexus between the use of mails and the pleading of the fraudulent scheme. Maybe you can help me understand that. Well, Your Honor, the district court erred by looking at this and saying, look, you've stated these facts, these various litigations, but you have not stated a proper mail fraud or wire fraud. We take the position that we not only name those statutes by name but we also identify them by number. I'm not saying you didn't establish a proper mail or wire fraud. The court was concerned about whether or not any fraud you may have established would result in appropriate damages under 8-Ball sufficiently pledged to get you recall standing. Even if you've got a mail fraud, that may not necessarily, in and of itself, get you recall standing. Not to mention 9-B. Well, and that's exactly right, Your Honor. I mean, under 9, this circuit has made a determination, I believe, or certainly the U.S. Supreme Court in the Rotella v. Woods case, we cite that in our case. And essentially it says that the pleading requirements of 9-B should be relaxed in the RICO context because of Rule 11-B-3, that we're pleading good faith. Look, my clients don't have all of the information. The fact that we have the information we have is nothing short of amazing. What we're doing is stating a short and plain statement of the claim showing we're entitled to relief. All we need to do, as you know, Your Honor, is state a plausible claim. We would like to have the opportunity to... How is Franklin Financial plausibly linked into your multi-step conspiracy? What are the facts that show that they were party to this, and I'm using your language from your brief, multi-step conspiracy? Okay. Going back to 2004, Franklin Financial administered the multimillion dollar estate of Lowell Gates. Lowell Gates is one of the board members. He is the linchpin. The relationship between Gates and Franklin Financial was never disclosed, but this is significant, Your Honor. Franklin Financial spent more than one year overseeing and reviewing the internal operations of CSI as part of its due diligence. And Franklin Financial specifically in the merger document said that no shares should be issued prior to the merger without their express written consent. So Franklin Financial was in the middle of all this. It's their consent to the conversion of the capital notes that makes them a co-conspirator to RICO in violations. Now, what have you pled that would lead someone to say it's plausible based on their signing off at a closing, that it's plausible that they're in on a RICO conspiracy that stretches back about a decade and involves mail-in wire fraud against third parties? Because it's got to be plausible, right? Right. What do you got? Well, what I got is the fact that they were involved with Lowell Gates at the beginning. They worked, they conducted due diligence as part of the merger arrangement. They were infinitely involved in every aspect of this case. What do you mean? I mean, we know and we accept your allegation that they knew people involved in the business. And we know and accept that they did due diligence as one would expect any purchaser to do. What besides those things makes them a co-conspirator to mail-in wire fraud in the in this particular case, what happened is Franklin Financial went to the Cadillac dealership, ordered an Escalade, and took delivery of a Yugo missing one wheel and a back seat. They sat there and allowed and watched... Why is this for a RICO claim? Because they were involved... As opposed to breach of contract. The question that I'm answering, Your Honor, is how were they involved in this? And the fact is, is that they paid, they offered to pay $1.13 million for this. And over the course of the process, the value of the stock was driven down so that this scheme could be finalized. And that is how we can attribute Franklin Financial's involvement in this. That's kind of where we started. You're arguing that the devaluation of the stock is what injured the plaintiff and that's what you're hanging your head on for RICO injury. Right. What they did was they drove down the value of the stock so that they can convert their loan, their $200,000 loan, into 1.3 million shares. Now, you're talking about a company that only had 200,000 outstanding shares at the time of the loan agreement right up until the, right up until the two days before the merger. And then on the day of the merger, it led to a huge dilution that caused my clients to lose approximately $450,000. And that's significant. Why don't you, why don't, why isn't that just sort of garden variety, breach of fiduciary duty, derivative claim? And we've pled that as well, Your Honor, but we've also, in this case, you have an enterprise, you have the board of directors working in concert. You're putting a rabbit in the hat. When you say you've got an enterprise, you're putting a rabbit in the hat. That's a legal conclusion. It may or may not be a RICO enterprise. But we've pled that, Your Honor, and the court is required to take our well-pleaded facts as true at this stage of the litigation. So what we, what we have pled is that you have an enterprise composed of... That's a conclusion of law, though. That's not, that's not a well-pleaded fact. You're pleading a conclusion of law when you say that you're pleading that you have an enterprise for purposes of RICO. Your Honor, I, we have 150 paragraph complaint. The, the, the complaint of our opponents here is that it's too long and long-winded. What we, what we attempted to do by that is to, you know, demonstrate to the court that there was a, that, that these people were working in concert, Franklin Financial and all of the individual defendants. You know, they didn't, they didn't just invest in the company. What they did was they gave it a loan. They covered themselves. And then they converted the, the, the loan amount into shares of stock. In the meantime, they drove down the value of the shares. And the only way, you know, we believe we will be able to show that the only way for this scheme to work is if the, if the value of the stock went down to 15 cents a share. We're talking about stock that at one point was selling for $20 a share. And that Franklin Financial was part of that scheme. That Franklin Financial thought it was in its interest to see the value of the asset it was about to purchase go right through the floor. Right. Why, why would they accept a company that, that, who, who was losing value every day? They sat back and allowed that to happen. Well, the only way that could happen and the, the reason for that is because they had a sweetheart deal themselves. They were taking a company with $70 million dollars in assets under management and a, and a, a $500,000 we estimate building. And they were getting it for $1.13 million. That's a bargain. Okay. So they were willing to sit back and allow this to happen and, and. Was it shopped on the market, the company? I believe in the, in the documentation or, or the proxy statement, there was some reference to there being, we believe the only real interested purchaser was Franklin Financial, but that, that may be a possibility. Can we, Roberto, do something about that buzzing? Is that feedback from the mic? What is that noise? I'll try not to breathe too much. That's right, Mr. Franklin. You shall cease breathing forthwith. Good morning, Your Honors. Mr. Franklin, how about, how about that? We might, we might make him stop breathing for you. Not only do you make out a RICO claim, you kill your opponent. He's a tough lawyer. Good morning, Your Honors. May it please the Court. Evan Lechman of Blank Rome on behalf of the individual defendants appellees in this matter. Judge Jordan, I think you hit the nail right on the head. This case is a case about a group of plaintiffs who are disgruntled shareholders who are trying to dress up what amounts to nothing more than a garden variety shareholder derivative claim into a RICO action. The case has none of the hallmarks of a traditional RICO claim. And as the district court appropriately found, there are four independent bases for which dismissal is warranted, which puts my adversary, a high burden on my adversary to show that each of those independent bases were an error. But focusing on the standing issue that you addressed. We haven't addressed anything. We've been questioning. I apologize. The standing issue that you were questioning about, the injury in this case is an injury, if any injury, to the you read the complaint. What about Mr. Farnon's argument that he's arguing a, not just the devaluation in the plaintiff's shares, but the value of those shares, but an actual change in the proportionate ownership of the company? Understood. And what Mr. Farnon did not address and what we addressed in our brief is that his whole theory is based on a scheme called creative destruction. It's played throughout their complaint. And what that scheme is, is that beginning in 2000, my clients, according to the plaintiffs, began to devalue, to waste the assets of the company. You can, it's replete throughout the complaint, that the focus is on wasting the assets, driving down the price of the company. A by-product, an indirect injury, perhaps if you believe what he's saying, is a dilution. But the courts are clear that that type of injury is indirect and insufficient to confer standing on a RICO claim. But they're also saying though that if there is a change in proportional ownership, that is something more than devaluation and that may get him RICO standing, right? It doesn't get him RICO standing, Your Honor, if that change in proportional ownership is a by-product of a direct harm to the company. And that's the Penmont Securities case where the court said, look, there's a causal break here. There's a harm to the company, which then in turn perhaps causes a dilution in shares. But it's that causal break which negates any standing under RICO. There's no direct injury. This, Mr. Horne and Steeve... Well, they claim that this was not garden variety waste and a dilution. That it was a deliberate scheme undertaken by a controlling group of shareholders with a fiduciary duty to the minority shareholders and that each of these pieces of the chain has to be looked at in the aggregate. And when you look at it in the aggregate, you can see that the aim and object was not to destroy the value of the firm generally, but to destroy their piece of the firm. So that your question is, if they walk away with 97% or 93% of the company, how is that an injury shared generally by the whole corporation if they walk away with 97% of the value when before this they were entitled to only 50-some percent? Understood. The injury that's shared universally is the injury that goes to the corporation. In order for this scheme to have been effectuated, there was, according to the plaintiffs, eight years of corporate waste. That injury, that corporate waste, was shared universally. It's universally applicable to the entire corporation and all shareholders. As a byproduct, perhaps, of that corporate waste, plaintiffs are alleging that there's some sort of shareholder dilution. The RICO acts are the waste of corporate assets. Yeah, I understand them to be saying not that the RICO acts are the waste. I understand them to be saying that the RICO predicate acts are mail-and-wire fraud acts committed against third parties. Those are the predicate acts they hang their hat on. That's how they dodged the PLSRA securities fraud bar. But that those predicate acts are part and parcel of an overall scheme which does not just include waste of assets, but this elaborate plan to dilute everybody else, which came to fruition finally at the time of closing. So when you say they waste the asset, that's a classic derivative harm. Sounds like that's the corporate law I learned, and I'm not sure they're even disagreeing with it. But the argument I think they're making to us, and Mr. Farrar will correct me if I'm wrong, is that that's not the whole thing. There are these other moving parts, and that's what makes up the RICO claim overall. So how do you respond to the assertion that there's individual and direct injury, not by virtue just of the waste, but by virtue of the capital notes being converted and all the other things that they allege? I address it in two ways. One, that injury is dependent upon the injury to the company, and that breaks the causal link, and that negates proximate causation. You cannot strip out the creative destruction scheme that they allege throughout their complaint and still have any alleged injury to the plaintiffs. So if they did all these things and then they walked in and they shot somebody, you'd say it doesn't matter whatever else happened. It's the derivative character of one piece of it that will always break the chain. Well, yes, but in this context, the only way their alleged dilution occurred was by wasting the corporate assets, and that's a harm to the company. But a second way to address this relates to the plausibility argument, as the district court found. Their scheme, if you're to believe what happened, they had the foresight in the year 2000 when they began engaging in this first predicate act to have the foresight to see five years later there would be a capital note entered with a change of control provision. And two years after that, the Pennsylvania Department of Banking would change its mandate, which would require the company to put itself up for sale. And a year after that, they'd have a willing buyer who would come in. All those things, there's really not a plausible scheme here, because talk about the cart before the horse, you have all the predicate acts, you'd have all these individual defendants. Why isn't that a question of facts? Why should that be knocked out and a motion dismissed? You're saying what they alleged is not true. I'm accepting all the facts as true. I'm not disputing a thing. If you accept every fact that as true, their predicate acts occurred beginning in 2000 and 2001. And somehow in 2000 and 2001, they could look into a crystal ball and see what was going to happen in 2005, 2007, and 2008. And that's just not a plausible, I mean, the district court found that there's no plausibility there. Is it correct that in 2005, your clients did not own a majority of the outstanding shares? That is correct. That is correct. And I'm careful when plaintiffs lump my clients, because my clients were not all members of a board of directors. It's important to note that one of my clients, Linda Gates, was merely the wife of a director. Another client, Hav Sivich, was on the board of directors for a number of years, but off well into that. So to lump my clients as a controlling group of a member of a board of directors is somewhat inaccurate. Well, how do they do that? I'm going to ask Mr. Fornadat if I get a crack at it, too. How is it that Mr. Hav Sivich works his way into this group as you understand it? It's a great question. I can tell you that he was at some time a member of the board of directors, but he was not on the board of directors when the 2007 proxy statement was issued, 2008 proxy statement was issued, which relates to the merger. He's not a member of the board of directors. So I think that question is best asked to plaintiffs' counsel, but there's no answer to that. Thank you, Your Honor. Thank you. Good morning. May it please the Court. My name is Tim Nieman, and I'm here today on behalf of Franklin Financial. I'd like to just focus in on how Franklin Financial plays into this, and Judge Jordan, I think you stated it correctly before. We have what is alleged here, a long scheme of events. We have fraud upon these third parties. Then these third parties bring litigation. Franklin Financial is not involved with any of those things. Then there's some sort of a settlement of those lawsuits. Again, Franklin Financial is not involved with any of those things. There's the capital notes are issued. Again, Franklin Financial is not involved in any way with the capital notes issuance. There's this continuing scheme, allegedly, and I think it was referred to as an elaborate scheme, and it is elaborate. I mean, if it really took place and it's plausible, and we never hear anything about the plausibility. But Franklin Financial doesn't even come onto the scene until the very end of this alleged scheme, and then in that situation, all Franklin Financial does is does due diligence, like any good business person or company that's buying a company would do, to find out whether they want to proceed with the sale. They don't do anything other than that, and there's really no allegation or no plausible allegation of what Franklin Financial did here. What the plaintiffs are trying to do is they're trying to recolize mergers between companies and to get disgruntled shareholders who either didn't use their dissenter rights that they had and they didn't take advantage of when they could have, or an oppressed shareholder derivative type claim that is more properly in the state court and is not a RICO claim. Isn't part of the problem here that at the time the proxy statement was issued, the company was valued at $2.79 per share, and then within a matter of months, it's down to $0.15 a share? In terms of exercising dissenter rights, you're voting on one thing when you have an understanding that you're getting close to $3 a share, and all of a sudden, you're getting $0.15 a share. And I know it sold for like $0.71 a share or something like that. Your Honor, that may be the case. And just from the perspective of Franklin Financial, Franklin Financial just paid a set price. It didn't go up or down depending on the number of shares. So Franklin Financial really had no involvement in that. But getting back to that, even if there weren't dissenter rights available at that point in time, there's nothing to stop the plaintiffs from bringing a derivative claim, from bringing some sort of a lawsuit. Well, they have. Well, they have here. They have here. But they're trying to also masquerade that derivative claim or the oppressed shareholder type suit into a RICO claim. I mean, my daughter's going to go out on Halloween as a witch. That doesn't mean that she's a witch. You can't dress this up to become something that it's not, and that's what they've done here, particularly with respect to Franklin Financial. And then we get to the plausibility portion of this. And that's really what the court hung its hat on, the lower court, was the plausibility. There's no mention of plausibility in the briefs. There was one mention of plausibility during the argument because it's just not plausible. And it's particularly not plausible that Franklin Financial, on the basis of offering a set price of doing due diligence, had anything to do with a RICO lawsuit or a claim. I guess, if I understand the argument, it is in part that it's irrational to think a sophisticated business organization like Franklin Financial would stick with a price figured at one point in time and then pay that same price for an asset which had dramatically devalued unless there was some other thing in it for them that they were in on this scheme. Because if they weren't in on this scheme, you wouldn't have a circumstance, as Mr. Farnon said, where they buy an Escalade but accept that delivery, you go with one wheel missing. But the plausible explanation for that is Franklin Financial are bad actors that are in on it now. What's your response to that? You're on my time's up, Mary. I wish you would. Yes. My answer to that is there's a whole host of reasons why businesses merge with companies. Sometimes they're in bankruptcy and they buy them out of bankruptcy. Sometimes they buy companies that are struggling financially like Franklin Financial, or I'm sorry, like Community Financial was. And the reason is because of efficiencies, mergers, the ability to combine operations, things along those lines. Mary, should I expect somebody, I mean, if I'm going in and I'm going to pursue the used car analogy, I really, I do agree to buy the Escalade. And when they roll out a completely different broken down car, I mean, isn't the ordinary human instinct to say that isn't what I agreed to buy? Now, I don't mind buying it, but I'd give you $1.50 now and not $20,000. How do you explain the response of Franklin Financial to the dramatic decrease in value of the company and still pursue and close it? Well, I think there's a number of reasons. And first of all, it's the things that I mentioned. There are efficiencies and things like that that would allow that to happen. But in addition- It's a heck of an efficiency to make up for the difference in stock price of over $2 down to 15 cents? Well, the difference in stock price was because the notes were exercised and the number of shares increased. So, of course, the stock price went down because Franklin Financial agreed to pay a fixed price. There was a fairness opinion issued with respect to that fixed price that said that it was a fair value for everybody involved in the transaction. Franklin Financial's payment wasn't dependent on the number of shares. It was fixed. And it was all disclosed in the proxy as well, which is a part of the pleadings here also. That's not completely true in terms of the valuation. Didn't the book value decline dramatically from June 30, 2008 to October 31, 2008? Yeah. Irrespective of dilution. Yeah. Yeah. I mean, I think there was a decline in the book value. The company, if you look at its operating results even before Franklin got involved with this or even before the capital notes, the company was losing money. So it's not as if we went in and we were buying an Escalade. I mean, at worst, it might have been the Yugo. And when we got it, it had the one wheel missing. And the thought was, well, for $25, we can put that new wheel on. And that's fine. We're going to go through with the deal. Thank you. Thank you. Just a few points, Your Honors. The important point about the harm to the company, the whole harm here is that there was a $1.13 million purchase price, and that remained the same throughout this. And Judge Jordan, you're exactly right. That is a concern here. With respect to what is in the pleadings that would date this all the way back to 2000, I direct the Court's attention to paragraph 36 of the amended complaint, where we allege that Plaintiff Matthew Amos, who was sitting on the Board of Directors, who started asking tough questions. That's what we've alleged in our complaint, and that's what this Court is required to accept as true. The issue of plausibility... You're talking about the Board. How does Mr. Havisevich figure in your scheme as a member of this control group? Okay. He was on the Board once, too. Why isn't Mr. Amos in the control group? That's a great question, Your Honor, and the answer is right in paragraph 82 of the amended complaint, because Mr. Havisevich received... He loaned the company. He was part of that $200,000 loan scheme. He loaned the company $50,000. He was on the Board. He had to leave the Board of Directors, and it's my understanding because he had other issues that I won't go into, but he had to leave the Board of Directors, and as a result of that, he still had skin in the game, even though he was not on the Board of Directors. So this is an enterprise. It's not merely a Board of Directors acting. It's people off the Board, but it was a group, an enterprise that was acting in concert to take my client's money, essentially $500,000. In this case, Your Honor, the point is that where there's smoke, there's fire. We have pled a lot of... Well, the fire may not be a vehicle fire. Maybe a shareholder's fire. Well, I mean, obviously, I respectfully disagree. I mean, we have a unique situation here. We have an enterprise, an association effect enterprise. I think we did a good job of, despite what Judge Caldwell says, we did a good job of pleading an association effect enterprise, and these issues that I'm hearing that are being raised, I listened to Mr. Neiman from Franklin Financial. It was all issues of fact. Issues of fact. Is this possible? Baiting all the way back. All questions of fact. We are at the motion to dismiss stage. Those may be very relevant points to make at summary judgment, but we're not there yet. We haven't had a chance to even conduct any discovery, to find out additional information, to find out what exactly is going on here. Okay, thank you. Thank you. I thank both sides for a very helpful argument. I take the matter into advisement.